# EXHIBIT 2
# to Request for Judicial Notice

**EXHIBIT 2**
to Request for Judicial Notice



UNITED STATES    OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 94th CONGRESS
SECOND SESSION

## VOLUME 122—PART 2

(JANUARY 28, 1976 TO FEBRUARY 4, 1976

(PAGES 1235 TO 2462)

(800) 666-1917

LEGISLATIVE INTENT SERVICE



UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1976

### REFERRAL OF JOINT RESOLUTION RELATING TO INTERNATIONAL MONETARY FUND—SENATE JOINT RESOLUTION 161

Mr. TAFT. Mr. President, I ask unanimous consent to be allowed to introduce at this time a joint resolution relating to the International Monetary Fund, and to insert comments in the RECORD with regard to the resolution; and I ask unanimous consent—I have conferred with the ranking members of the appropriate committees—that the joint resolution be referred sequentially to the Committee on Foreign Relations and to the Committee on Banking, Housing and Urban Affairs.

The PRESIDING OFFICER. Is it the intention after it has been reported from the Committee on Foreign Relations that it then go to the Committee on Banking, Housing and Urban Affairs?

Mr. TAFT. That is correct, sequentially to the Committee on Foreign Relations and the Committee on Banking, Housing and Urban Affairs.

The PRESIDING OFFICER. Is there objection? The Chair hears none, and it is so ordered.

### ORDER INDEFINITELY POSTPONING SENATE CONCURRENT RESOLUTION 80

Mr. MANSFIELD. Mr. President, I ask unanimous consent, in view of the action taken by the distinguished Senator from Ohio just now, that Calendar No. 554, Senate Concurrent Resolution 80, be taken off the calendar.

Mr. TAFT. I concur and, I may say, the other cosponsors concur.

The PRESIDING OFFICER. Does the Senator mean to indefinitely postpone?

Mr. MANSFIELD. Yes.

The PRESIDING OFFICER. Without objection, it will be indefinitely postponed.

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

### EXECUTIVE SESSION

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the Senate go into executive session to consider a nomination on the Executive Calendar under the heading "The Judiciary."

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will state the nomination.

### THE JUDICIARY

The assistant legislative clerk read the nomination of George N. Leighton, of Illinois, to be a U.S. district judge for the Northern District of Illinois.

The PRESIDING OFFICER. Without objection, the nomination is confirmed.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the President be immediately notified of the confirmation of this nomination.

The PRESIDING OFFICER. Without objection, it is so ordered.

### LEGISLATIVE SESSION

Mr. MANSFIELD. I ask unanimous consent that the Senate return to legislative session.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. BIDEN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

### EQUAL CREDIT OPPORTUNITY ACT AMENDMENTS

The Senate continued with the consideration of the bill (H.R. 6516) to amend title VII of the Consumer Credit Protection Act to include discrimination on the basis of race, color, religion, national origin, and age, and for other purposes.

Mr. BIDEN. Mr. President, I ask unanimous consent that the committee amendment be considered and agreed to as original text for the purpose of further amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BIDEN. Mr. President, I ask unanimous consent that Ralph Rohner and Pat Abshire of the staff of the Committee on Banking, Housing and Urban Affairs, and Pete Wentz of my staff and Don Wall of Senator GARN's staff, and Gil Bray and Tony Cluff, be given privileges of the floor during consideration and votes on H.R. 6516 and H.R. 8835.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BIDEN. Mr. President, I am happy to bring before the Senate this bill, H.R. 6516, to amend the Equal Credit Opportunity Act. Though it carries a House number, the text of the bill is that which was developed carefully and meticulously by the Banking Committee over a period of 6 months, and approved by the committee shortly before the Christmas recess. Our text was substituted for that of the House bill, and the fact that both Houses of Congress have acted on this legislation gives a good indication of its importance and I hope its continued support.

Senators will recall that in 1974 Congress enacted the Equal Credit Opportunity Act prohibiting discrimination in credit transactions on the basis of sex or marital status. This legislation is the natural and logical extension of the policy of barring discriminatory practices in the credit field.

The key provisions of the bill are as follows:

First. It expands the categories of prohibited credit discrimination to include race, color, religion, national origin, age, receipt of public assistance benefits, and exercise of rights under the Consumer Credit Protection Act. For the age and public assistance categories, the bill recognizes that these factors do bear on creditworthiness and may be used by creditors as part of their credit-granting standards, including use in a statistical credit scoring system. The bill also exempts certain "affirmative action" credit programs from these prohibitions;

Second. The bill requires creditors to give reasons for credit denials on request;

Third. It combines the Advisory Committee under the Equal Credit Opportunity Act with the existing one under the Truth in Lending Act.

Fourth. It expands the civil liability provisions in the present act; the ceiling on class action liability is set at the lesser of $500,000 or 1 percent of the creditor's net worth; enforcement actions by the Attorney General are authorized; the statute of limitations is extended to 2 years, and an additional year is permitted for individual actions after a public enforcement action has been commenced; double recovery of monetary damages is prohibited;

Fifth. It authorizes the Federal Reserve Board to exempt from provisions of the act any class of business credit transaction on a finding that the act's protections are not necessary for that business credit transaction;

Sixth. It further clarifies that States are free to enact legislation more protective of credit applicants than this act, and transactions subject to such laws may be exempted from the requirements of this act.

Mr. President, it seems to me that the need for this legislation is clear. Credit has ceased to be a luxury item, either for consumers or for business entrepreneurs. Consumer credit outstanding continues to grow at a phenomenal rate and pace and now stands slightly below $200 billion, not even counting family mortgage credit which would add more than $400 billion to that total. Virtually all home purchases are made on credit. I think it is important to emphasize that point, that the scope of consumer credit outstanding is near $200 billion. It covers an awful lot of ground and obviously a great deal of money, and virtually all home purchases are made on credit. About two-thirds of consumer automobile purchases are on an installment basis. Large department stores report that approximately 50 percent or more of their sales are on revolving or closed-end credit plans. Upwards of 15 percent of all consumer disposable income is devoted to credit obligations other than, and I emphasize other than, home mortgages.

In this circumstance the bill establishes as clear national policy that no credit applicant shall be denied the credit he or she needs and wants on the basis of characteristics that have nothing to do with his or her credit worthiness.

Discrimination against the elderly was the most often cited abuse in our hearings, despite the fact that in the experi-



LEGISLATIVE INTENT SERVICE    (800) 666-1917

Case 3:12-cv-00606-JAG   Document 18-2   Filed 10/26/12   Page 4 of 4 PageID# 76

ence of many creditors their older customers were their best paying customers.

Past instances of discrimination against racial minorities were also cited in the record. More recently, studies conducted by Federal agencies have indicated the strong probability, and I must emphasize it is only probability, of race discrimination in mortgage credit.

In short, this bill identifies characteristics of applicants which are, and must be, irrelevant to a credit judgment, and prohibits or curtails their use in determining whether or not credit should be granted.

The bill balances the need for protection against discrimination and the creditors' need for sufficient information to make informed judgments and avoid unsound practices. The prohibitions against discrimination on the basis of race, color, religion, and national origin are absolute, but creditors can consider an applicant's age or source of income in order to assess that applicant's credit-worthiness. Thus a creditor justifiably may inquire how close to retirement an applicant is so that he may judge whether the applicant's income will continue to be sufficient and at a sufficient level to support the credit extension. Similarly, the creditor is entitled to ask the applicant's age to gage the pattern or intensity of his or her credit history.

I believe that the provision entitling rejected applicants to a statement of reasons for adverse action is among the most significant parts of this bill. With few exceptions, creditors have refused to do anything more than notify rejected applicants of the fact that they have been rejected. Only rarely do creditors give them an explanation as to the reasons why, and when that is done, it is usually in a cursory manner. The creditors' apparent rationale has been that since they had no legal obligation to explain their action they would not venture the effort or the potential embarrassment of venturing such an effort.

Here is how the "giving of reasons" requirement would work: assume Harry Smith applies for a modest home improvement loan, but the bank decides that Smith's income is inadequate. The bank may write directly to Smith informing him of their decision and their reasons for the decision. Or, if the bank does not wish to state the reason initially, it may give Smith a written notice substantially as follows, and I drafted a particular type of letter which would suffice under this legislation, as we all understand it:

DEAR MR. SMITH: We are sorry we cannot approve your loan application at this time. If you care to call our office at 123–4567, we will be happy to explain the reasons for this decision, and you may have that explanation confirmed in writing by writing to me at this address.

Sincerely,

———————————,
*Loan Officer.*

In this case the creditor can give the statement of reasons orally, since he has notified the applicant that the applicant has a right to a statement confirmed in writing as to why he has been denied. If this letter omitted the reference to a written confirmation, the reasons would have to be given in writing whether the applicant phoned or wrote for them.

The present Equal Credit Opportunity Act regulations do require creditors to give reasons on request. This bill does not question the Federal Reserve Board's authority to promulgate such a requirement under the present law. Rather, this bill is intended to confirm such a requirement and to provide an explicit statutory mechanism for it.

I will conclude with a comment on the enforcement provisions in the bill, particularly the revised class action ceiling.

The bill provides enforcement opportunities of three kinds. Under section 704—which remains essentially unchanged—various Federal agencies are given administrative enforcement responsibility. Under the revised section 706, the U.S. Attorney General is also authorized to bring enforcement actions, either on referral of cases from the administrative agencies, or on the Attorney General's own initiative where there are patterns or practices in violation of the act. The entrusting of enforcement responsibility to the Attorney General is premised on the assumption that that office's experience in the enforcement of other civil rights legislation can be effectively expanded and built on to achieve maximum compliance with the antidiscrimination policies of the Equal Credit Opportunity Act.

The chief enforcement tool, however, will continue to be private actions for actual and punitive damages. Much of the testimony received in the hearings, and much of the debate in subcommittee and committee centered on the adequacy of the recovery ceiling for punitive damages in class actions. The present law sets that ceiling at the lesser of $100,000 or 1 percent of the creditors' net worth. The subcommittee had recommended that this be changed to the greater of $50,000 or 1 percent. The committee eventually agreed upon a level of $500,-000, or 1 percent of the creditor's net worth, whichever is less.

The setting of any ceiling on class action liability is meant to limit the exposure of creditors to vast judgments whose size would depend on the number of members who happened to fall within the class. The risk of any ceiling on class action recoveries is that, if it is too low, it acts as a positive disincentive to the bringing of such actions and thus frustrates the enforcement policy for which class actions are recognized.

The $500,000 or 1 percent formula is clearly a compromise and should be accepted on that basis. I would be the first to acknowledge—and I believe the ranking minority member of the subcommittee agrees with me—that the class action has not been and probably never will be the ideal private enforcement tool. For this reason he and I are anxious to explore alternative techniques for involving persons other than the Government in the enforcement process. One of these alternatives is the so-called qui tam action which the subcommittee will examine in the near future.

Mr. President, I urge that this bill be passed so that we may quickly reconcile the few differences between the House bill and ours, and send the Equal Credit Opportunity Act amendments to the President for his signature.

Mr. President, I yield now to the distinguished ranking minority member, who has worked very hard and has spent more time on this matter than probably anyone else, for his comments.

The PRESIDING OFFICER (Mr. HELMS). The Senator from Utah is recognized.

Mr. GARN. I thank the Senator.

Mr. President, I am in complete accord with the objectives of H.R. 6516, the Equal Credit Opportunity Act amendments, which were intended to prohibit discrimination in the granting of credit on the basis of race, color, religion, national origin, and age. Although credit is not a right, discrimination on the basis of a person's membership in a group is inimical to fundamental principles of fair play.

There was not, however, hard evidence presented during the committee hearings that discrimination in fact was being practiced in the consumer or commercial credit area. Some data was called to the attention of the committee indicating that discrimination has been practiced in some areas of the country in home mortgage lending. However, recently Congress has enacted a number of laws to remedy that specific problem.

Representatives of senior citizen groups did testify that they had received a steady flow of complaints from their membership describing cases of credit discrimination based solely on age. They believe that the letters received by their associations on this subject establish a clear pattern of discrimination against older persons by certain credit grantors.

On the other hand, the lenders and retailers told the committee that very little if any discrimination in the covered categories exists. The industry points out that it is not to their member's interest to discriminate, except on a person's ability and willingness to repay. It seems that competition in the marketplace has cleared up the historic discrimination in consumer credit granting which may have existed in the past.

Although I do feel that the Consumer Affairs Subcommittee and the full Banking Committee did a commendable job in eliminating some of the more burdensome provisions in this legislation, my general concern throughout the consideration of this proposal has been that the committee did not fully measure the need for the legislation and benefits to some consumers against the cost to both the industry and ultimately all consumers. No matter how laudable the purpose of consumer legislation or how effective its enforcement, there is always the danger that a law will produce side effects which may be harmful to the general public.

One of the unintended and unfortunate side effects of recent consumer credit legislation has been that it is placing too great a compliance burden on small merchants who feel a sense of frustration in trying to cope with regulations which they do not understand and for

LEGISLATIVE INTENT SERVICE    (800) 666-1917